IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

SHANNON BERLANT,                          )
                                          )
                Plaintiff,                )       TC-MD 190141N
                                          )
        v.                                )
                                          )
CLATSOP COUNTY ASSESSOR,                  )
                                          )
                Defendant.                )       **DECISION**

Plaintiff appeals the real market value of property identified as Account 57297 (subject property) for the 2018-19 tax year. A trial was held on December 5, 2019, in the courtroom of the Oregon Tax Court. Steve Anderson (Anderson), a real property appraiser, appeared and testified on behalf of Plaintiff. Christopher Leader (Leader), Appraisal Supervisor, appeared and testified on behalf of Defendant. Plaintiff's Exhibit 1 and Rebuttal Exhibit 1 and Defendant's Exhibit A and Rebuttal Exhibits B and C were received without objection.

## I. STATEMENT OF FACTS

The subject property is a single-level, 2,973 square-foot house situated on a 7.15-acre oceanfront lot in the gated Surf Pines subdivision in an unincorporated part of Clatsop County. (*See* Ptf's Ex 1 at 3; Def's Ex A at 3, 5; Rebuttal Ex B at 1.) Between 2.19 and 2.34 acres of the subject property lot is buildable. (*Id.*) Plaintiff purchased the land for $210,000 in April 2014 and constructed a house that was complete as of January 1, 2018. (*Id.*) The subject property lacks an ocean view due to the height of dunes between the house and the ocean. (*Id.*)

A.      *Sales Comparison Approach*

Both Anderson and Leader agreed it was difficult to find good comparable sales. (*See* Ptf's Ex 1 at 4; Def's Ex A at 6.) Anderson tried to find sales within 12 months of the January 1,

2018, assessment date including some older homes, whereas Leader selected older sales in order to use houses of similar age and quality to the subject property. (*See id.*) Anderson testified that the subject property was overbuilt for the neighborhood based on its superior quality, single-level, and somewhat smaller size compared with comparable sales. Leader disagreed, noting that the subject property is a class 5+ quality home and "the average living area of all class 5 and 6 homes * * * on 1 acre or larger parcels in Surf Pines is 2,999 square feet and the median is 2,841 square feet." (Def's Rebuttal Ex B at 2, citing Ex C.)

1. *Plaintiff's comparable sales*

Anderson typically tries to find six sales to bracket the subject property but could only identify four comparable sales, summarized below. (Ptf's Ex 1 at 4.) All the sales were in the same subdivision as the subject property. (*See id.*) Anderson testified that the first two sales were on the same road as the subject property and the third was located 200 feet away. (*Id.* at 5.) He adjusted for age, garage, condition, bathrooms, quality, size, time, and land. (*Id.*)

| | Subject Property | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|---|
| Location | Warrenton | Warrenton | Warrenton | Warrenton | Warrenton |
| Oceanfront? | Oceanfront | Oceanfront | Oceanfront | Ocean view | Territorial |
| Lot size | 7.15 | 6.00 | 3.98 | 1.03 | 1.11 |
| Bed/Bath | 3bd, 3/1ba[1] | 5bd, 3/2ba | 3bd, 2ba | 4bd, 4/1ba | 5bd, 4/1ba |
| Square Feet | 2,973 | 4,040 | 3,180 | 5,140 | 5,310 |
| Year Built | 2016 | 1990 | 1979 | 1990 (remodeled[2]) | 2005 |
| Sale Price | | $650,000 | $493,500 | $744,300 | $929,000 |
| Sale Date | | 6/16/17 | 6/1/18 | 1/17/19 | 1/4/18 |
| Adj. Price | | $808,500 | $828,500 | $762,700 | $824,700 |

[1] The first number refers to full bathrooms and the second to partial or half bathrooms. (*See* Ptf's Ex 1 at 3, 17-24.)

[2] "Purchased for $600K. Extensive remodel cost addl $600K. * * * Shows as new, never occupied. * * * NOT in flood zone OR within ¼ mile of the ocean." (Ptf's Ex 1 at 21 (RMLS description).)

(Ptf's Ex 1 at 4-8, 17-24.)  Based on those sales, Anderson concluded a real market value of $806,000 for the subject property.  (*Id.* at 6.)

Leader questioned Anderson about his adjustments for site size, view, and garage.  (*See also* Def's Rebuttal Ex B.)  Anderson testified that he could not determine how the market valued an ocean view as compared with a territorial view, so he made a $125,000 adjustment to both sales 3 and 4, neither of which was oceanfront.  Leader questioned why Anderson made negative garage adjustments to sales 1 through 3, each of which had a smaller garage than the subject property.  (*See id.* at 2.)  Anderson agreed and revised his garage adjustments as follows: +$8,185 for sale 1; +$8,385 for sale 2; +$7,827 for sale 3; and -$8,247 for sale 4.

Leader questioned the comparability of Anderson's sales, noting that he made very large adjustments for quality and condition to his first two sales: $150,000 and $230,000, respectively.  (*See also* Def's Rebuttal Ex B at 1.)  Anderson's sale 1 lacked curb appeal and its sale price was impacted by unpermitted work performed prior to sale.  (*See id.*)  "Sale 2 was built in [1979] and is of significantly lower quality."  (*Id.*)  Sale 3 was nearly twice as large as the subject property and sale 4 featured an unusual design: it is essentially two houses connected by a breezeway.[3] (*See id.* at 1-2; *see also* Def's Rebuttal Ex C at 7-8.)  Leader questioned whether sale 4 complied with applicable code and suffered from functional obsolescence based on its design.  Anderson testified that he did not think sale 4 suffered from any functional obsolescence.

2.    *Defendant's comparable sales*

Leader found "no closely comparable oceanfront properties in Surf Pines that recently sold," so he "expand[ed] the search further back in time" and identified three comparable sales, summarized below.  (Def's Ex A at 6-7.)  His first two sales were both in the Surf Pines

---

[3] The RMLS describes it as a "multi-generational living experience."  (Ptf's Ex 1 at 23.)

subdivision but sale 3 was in the superior gated community of Pinehurst and had an ocean view. (*See id.*) Leader adjusted his sales for time, personal property included in sale, location, site size and view, square feet, bathrooms, garages, and fireplaces. (*See id.*) His gross adjustments ranged from 21 to 38.9 percent with the largest adjustments for time: $121,238 to sale 1 and $174,107 to sale 2. (*Id.* at 6, 8, 19 (land and time adjustments).) Leader testified that he worked as a fee appraiser in the past and the standards for adjustments were no more than 15 percent net and 25 percent gross, which is hard to do with coast properties but he achieved with sale 3.

| | Subject Property | Sale 1 | Sale 2 | Sale 3 |
|---|---|---|---|---|
| Location | Warrenton | Warrenton | Warrenton | Gearhart |
| Oceanfront? | Oceanfront | Oceanfront | Oceanfront | Ocean view |
| Lot size, acres | 2.34 | 1.30 | 2.25 | 1.00 |
| Bed/Bath | 3bd, 3/1ba[4] | 2bd, 2/1ba | 3bd, 3/1ba | 3bd, 3/1ba |
| Square Feet | 2,973 | 3,184 | 3,378 | 2,779 |
| Year Built | 2016 | 2008 | 2008 | 2003 |
| Sale Price | | $800,000 | $785,000 | $950,000 |
| Price per SF | | $251.26 | $232.39 | $341.85 |
| Sale Date | | 5/26/16 | 9/3/15 | 6/28/17 |
| Adjusted Price | | $967,218 | $954,507 | $923,782 |

(Def's Ex A at 6-7.) Leader placed emphasis on sales 1 and 2, which were similar to the subject property in location, view, and site size, and concluded a real market value of $950,000 for the subject property. (*Id.* at 7.)

Anderson questioned Leader about his above and below grade living area adjustments and the difference between the Warrenton and Gearhart markets. He disputed the use of any properties in Gearhart as comparable to the subject property because they are not similar markets; the average value of a house in Gearhart in was $389,000 in 2017 whereas the average value of a house in Warrenton was $295,000. (Ptf's Rebuttal Ex 1.) Leader testified that his

---

[4] The first number refers to full bathrooms and the second to partial or half bathroom. (*See* Ptf's Ex 1 at 3, 17-24.)

adjustments for living area were based on a paired sales analysis and standards used by other appraisers, though neither is in evidence. He testified that the difference between the Warrenton and Gearhart markets is reflected in his location adjustment to sale 3.

B.    *Cost Approach*

Anderson testified that he did not use the cost approach because it typically exceeds market value. Leader testified that he completed the cost approach using the Department of Revenue cost factor book and concluded a value of $732,542 for the improvements. (*See* Def's Ex A at 9.) He added to that a value of $297,815 for land and site developments, resulting in a total indicated value of $1,030,357. (*See id.*) Leader testified that the subject property building permit reported a cost of $750,000, supporting his analysis. (Def's Rebuttal Ex B at 3, Ex C at 9.) In reconciliation, Leader placed emphasis on the market approach and concluded a value of $950,000 for the subject property. (Def's Ex A at 10.)

C.    *Tax Roll and Requested Values*

The subject property's 2018-19 tax roll real market value was $922,117 and its maximum assessed value was $747,630. (Def's Ex A at 10.) Plaintiff requests a real market value of $806,000 with a corresponding reduction to maximum assessed value.[5] Defendant requests a real market value of $950,000 and a maximum assessed value of $766,897. (*See id.*) Defendant explained that its opinion of value increased after seeing that "the interior's design and finish materials were of better quality than estimates prior to an interior inspection." (*Id.*)

/ / /

/ / /

/ / /

---

[5] The 2018-19 maximum assessed value is at issue because the improvements were new.

## II. ANALYSIS

The issue before the court is the 2018-19 real market value of the subject property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor,* TC–MD 020869D, 2003 WL 21263620 at *2 (Or Tax M Div Mar 26, 2003). "Real market value" is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[6] "As has often been said, [real market value] is a range of value, rather than an absolute." *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977) (observing that proving an eight percent reduction from the assessed value was "an almost impossible task"). The assessment date for the 2018-19 tax year was January 1, 2018. ORS 308.007; ORS 308.210.

Real market value "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three approaches to value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308-0240(2)(a)[7]; *see also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). Although all three approaches must be considered, all three approaches may not be applicable. *Id*. Here, the parties each presented evidence under the sales comparison approach. Defendant also presented a cost approach but did not place any emphasis on it.

The party seeking affirmative relief bears the burden of proof by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

[7] Oregon Administrative Rule (OAR).

Evidence that is inconclusive or unpersuasive fails to meet the burden of proof. *See Reed v. Dept. of Rev.*, 310 Or 260, 265 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Here, Plaintiff bears the burden of proof with respect to her request to reduce the real market value from $922,117 to $806,000, and Defendant bears the burden of proof with respect to its request to increase the real market value to $950,000.

A.     *Sales Comparison Approach*

"In utilizing the sales comparison approach, only actual market transactions of property comparable to the subject, or adjusted to be comparable, may be used." OAR 150-308-0240(2)(c). "The court looks for arm's length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value" of the subject property. *Richardson*, 2003 WL 21263620 at *3.

Each appraiser relied primarily, if not solely, on the sales comparison approach and each acknowledged the difficulty of finding sales comparable to the subject property. Anderson opted to use sales that occurred close to the January 1, 2018, assessment date with the trade-off that his sales differed — sometimes significantly —in age, quality, condition, and size. He concluded a value of $806,000, which was understated somewhat based on errors in his garage adjustments. The magnitude of adjustments required to Anderson's sales undercuts their reliability as evidence of the subject property's real market value.

Leader made a different trade-off in selecting comparable sales: in order to use newer houses, he chose two older sales from 2015 and 2016, as well as a third sale from a superior area. Based on those sales, he concluded a real market value of $950,000. Leader had to make large

time adjustments to his first two sales and a large location adjustment to the third, calling into question their comparability to the subject property as of January 1, 2018.

Although the court appreciates the difficulty of finding good comparable sales for the subject property, the court finds the evidence presented under this approach inconclusive.

B.    *Cost Approach*

"In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006), citing Appraisal Institute, *The Appraisal of Real Estate* 63. "The cost approach is 'particularly useful in valuing new or nearly new improvements' * * * [but] is less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." *Id.* internal citations omitted). "[C]ost and market value can be more closely related when properties are new." *Anderson v. Lane County Assessor,* TC–MD 090298 at 6 (Or Tax M Div Nov 17, 2009).

Leader determined a value of $1,030,357 under the cost approach. Although he did not place weight on the cost approach, he found it supportive of his value conclusion under the sales comparison approach. Anderson testified that the cost approach typically yields a value exceeding the real market value. That may be true in some instances, but the subject property was new as of January 1, 2018, making the cost approach somewhat relevant here.

C.    *Reconciliation*

The court finds Defendant's real market value evidence more persuasive than Plaintiff's. Leader supported his opinion of value using two approaches to value. However, the court finds inadequate evidence to support Defendant's requested increase in real market value. First, the

requested increase over the current real market value is small; it is well under the eight percent change at issue in *Price*. Second, the current real market value is close to the low end of the range indicated by Leader's comparable sales: $922,117 vs. $923,782. Third, as discussed above, each of the comparable sales required large adjustments for time or location. For those reasons, the court concludes that the 2018-19 tax roll values should be sustained.

### III. CONCLUSION

Upon careful consideration, the court concludes that neither party presented sufficient evidence to support changing the subject property's 2018-19 tax roll values. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

IT IS FURTHER DECIDED that Defendant's request to increase the subject property's 2018-19 real market value is denied.

Dated this \_\_\_\_ day of April 2020.

 

 

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Allison R. Boomer and entered on April 28, 2020.*